**Opinion issued July 20, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-21-00691-CR**

———————————

**CHRISTOPHER WAYNE MCDONNELL, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the County Court**
**Colorado County, Texas**
**Trial Court Case No. 25734**

# O P I N I O N

A jury convicted appellant, Christopher Wayne McDonnell, of assault causing bodily injury against a family member, a class A misdemeanor.[1] The trial court assessed McDonnell's punishment at one year's confinement in the county

---

[1]    *See* TEX. PENAL CODE § 22.01(a)(1), (b), (b–3).

jail, with all but two consecutive weeks to be probated for two years. In three issues, McDonnell argues that the trial court abused its discretion (1) in denying his request for a mistrial; (2) by permitting the State to introduce evidence that he had previously threatened and assaulted the complainant; and (3) in finding that the probative value of extraneous evidence was not substantially outweighed by the danger of unfair prejudice.

We affirm.

## Background

McDonnell married the complainant in this case, N. Orsak, in 2006. Sometime prior to May 2019, McDonnell and Orsak separated and Orsak filed for divorce. On May 4, 2019, Orsak had spent part of the day with her and McDonnell's minor son and some of her son's friends before returning their son to McDonnell's home. Orsak dropped their son off and picked McDonnell up so that they could attend a Kentucky Derby party together.

Orsak testified that McDonnell had already had some drinks before they left his house for the party. At the party, she and McDonnell both had drinks. Orsak testified that McDonnell "had at least two mint juleps [at the party] and then he switched to just straight bourbon." According to Orsak, McDonnell accused her of hitting on another guy at the party and told her that she was embarrassing him. Orsak stated that McDonnell "was slurring his words and he was drunk," so she

decided it was time for them to leave. Orsak drove and McDonnell sat in the passenger seat.

Orsak testified that, on the drive home, McDonnell proceeded "to cuss at [her] and call [her] a slut and a whore." She stated that McDonnell threw a 20-ounce YETI tumbler full of ice water at the side of her face. She was trying to drive and asked him to stop, but he picked up a smaller YETI tumbler cup and threw that at her face as well. After it struck the side of her face, McDonnell told Orsak, "I don't think that was hard enough," and threw it again, aiming for her window. McDonnell then struck her with his arm and the back of his hand, and he pulled her hat off of her head and struck her with that as well. She stopped the car and told him to get out, but he would not exit the vehicle. She drove the rest of the way to his home, where he continued to yell at her. He asked for her phone, telling her he was going to read her text messages because he believed she was "texting all these men." Once he had her phone, he exited the car and went into his home.

Orsak testified that after McDonnell left her car, her "face was hurting so bad." She decided to go to the doctor because, "when he hit me before I had broken a bone in my face." McDonnell objected to this testimony, and the trial court sustained the objection. The trial court granted McDonnell's request for an instruction to the jury to disregard, but it denied his request for a mistrial.

Orsak went on to testify that she drove to the emergency room. She testified that the YETI cup and McDonnell's hand had caused "a lot of pain" when they struck her. However, her "x-rays did not show any broken bones." The emergency room staff called the police and Orsak reported the assault.

On cross-examination, Orsak acknowledged that she attended an Astros game with McDonnell and their son four days after the incident. Orsak testified that it was their son's thirteenth birthday, and they had the game planned "for quite some time." Several days after the assault, she also celebrated Mother's Day with McDonnell, their son, and both her and McDonnell's mothers, which, again, had been planned since before the assault. Orsak also acknowledged that she picked McDonnell's car up after he was arrested in connection with the assault and posted bond using his money so that he could be released from jail. She stated that she did this because their son asked her "to help his dad out" and she wanted "to do anything [she could] to try to preserve some version of a family for him."

Finally, Orsak acknowledged that she went on a vacation with McDonnell a couple of months after the assault. She testified that she did so because she "just wanted to try to make things work, whether it worked as being separated and friendly, I—I—I don't know, I just wanted to try to make peace." She stated that she was "afraid to not have things be peaceful" and that she was "very afraid" of McDonnell. Orsak testified that, despite the issues in their marriage and the fact

that she had filed for divorce, she had still hoped that they might work things out. She further testified that, even though they were divorced at the time of trial, she would still have to "deal with" McDonnell "forever" because they have a child together.

As part of his cross-examination, McDonnell's attorney presented evidence, including photographs, of the various outings and communications between McDonnell and Orsak following the assault. The State objected repeatedly, arguing that the evidence was not relevant and asserting that it called Orsak's credibility into question. The State argued that, if McDonnell was allowed to introduce evidence of their ongoing relationship, then the State should be permitted to present evidence of other times that McDonnell had assaulted Orsak as well as expert testimony on the common responses to domestic violence. The trial court denied the State's objections in connection with the photographs and testimony of the ball game, Mother's Day event, and vacation.

McDonnell's attorney also presented an email from Orsak to McDonnell that contained information she had found for him to help him enter his plea of not guilty in this case. McDonnell also sought to introduce into evidence an email in which Orsak stated that she would buy a gun for McDonnell to replace one that she had taken with her when they separated. The State again objected, and the trial

5

court ruled that it would admit the email, "but I'm going to allow [the State] to go into a little further extraneous information to explain the possible relationship."

The trial court provided a limiting instruction on the record, and the State questioned Orsak about whether McDonnell had assaulted her prior to the May 4, 2019 incident. She testified that he had assaulted her "[m]ore than ten [times]—numerous" times. Orsak eventually described two specific incidents—one in which he pushed her, and another in which he punched her in the face. She testified that she had filed a police report regarding an incident that had occurred in 2016.

Orsak further testified that McDonnell had threatened her and asked her not to testify against him in this case. The State presented screenshots of text messages that McDonnell had sent to Orsak in 2021, prior to the trial. The text messages included sexually-explicit pictures that McDonnell threatened to show to the court and to her current and former boyfriends. Orsak stated that she "knew at the time they came in late that night, that [McDonnell] was threatening me to not testify because he was going to show these kinds of pictures to the Court to make me look bad." Orsak testified about another threat made by McDonnell in 2021, testifying that he told her "that now that he didn't have a divorce attorney who had been keeping him with a muzzle, that he was going to do everything he could to destroy me, now and even after this court case was over, that it would never end."

6

In addition to Orsak's testimony, the State provided testimony from M. Hill, an expert regarding common characteristics of battered women. She provided general information about the reasons abused women stay with their abusers and the reasons they sometimes recant allegations or request that criminal charges be dismissed.

McDonnell's father, Wayne McDonnell, testified that he attended the Astros games with McDonnell, Orsak, and their son. He stated that Orsak was friendly, she did not say that she had been assaulted, and he did not observe any bruising or injuries. Orsak's mother testified that she had observed that McDonnell got angry when he was intoxicated and that she had seem him angry on "many occasions." She stated that McDonnell could be "[v]ery loud, just loud language, abusive, loud talking, very angry," and he would direct this anger at Orsak. She described one occasion in which she heard McDonnell and Orsak arguing in the next room, then she heard something being thrown, and then observed that Orsak's "mouth was bleeding" when she saw her.

McDonnell himself testified, stating that he had "a lot" to drink the day of the Kentucky Derby party. He testified that he and Orsak had a verbal altercation that started when she "lit into" him about something. He denied striking Orsak. He testified that he remembered a YETI cup, however, because Orsak used one to break the window of his vehicle on a prior occasion.

He testified that Orsak left her phone with him and wrongly accused him of taking it. When he told her he did not have it, she "went ballistic," destroying a pair of his sunglasses, a hat, and his key fob. He found her phone the next morning after he was sober and returned it to her. He testified that he did not assault Orsak.

The jury charge included an instruction regarding extraneous-offense testimony:

> During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the information. The other wrongful acts, being alleged assaults, other than charged in the information. The state offered the evidence to contextualize the nature of the relationship between the victim and the defendant and to show the defendant's consciousness of guilt. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it.
>     Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

The jury found McDonnell guilty. McDonnell now challenges the trial court's denial of his motion for mistrial and admission of extraneous-offense evidence that he had assaulted and threatened Orsak on other occasions beside the incident with which he was charged in this case.

## Denial of Mistrial

In his first issue, McDonnell argues that the trial court abused its discretion in denying his motion for mistrial in connection with Orsak's unprompted statement that "when [McDonnell] hit me before I had a broken bone in my face."

## A.     Standard of Review

We review the denial of a motion for mistrial for an abuse of discretion. *Balderas v. State*, 517 S.W.3d 756, 783 (Tex. Crim. App. 2016); *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In applying an abuse-of-discretion standard of review, we uphold the trial court's decision to deny a mistrial "if it was within the zone of reasonable disagreement." *Archie*, 221 S.W.3d at 699 ; *see also Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (including its prejudicial effect), (2) the effectiveness of the curative measures taken, and (3) the certainty of the conviction or punishment assessed absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We reverse only if no reasonable view of the record could support the trial court's ruling. *See McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012).

**B.    Analysis**

As the State questioned Orsak about the night of the assault, the prosecutor asked, "And what did you do when you left the house [after dropping McDonnell off following the assault]?" Orsak answered, "I—my face was hurting so bad, my—when he hit me before I had broken a bone in my face before, so I said I'm going to go to the doctor." McDonnell objected, pointing out that the trial court had ordered that the parties not bring up extraneous offenses without approaching the court, "and the witness has just blurted a prior incident where she alleges he broke her bone." The State responded that the reference to a prior assault was "inadvertent."

The trial court ruled that it would instruct the jury to disregard Orsak's statement, and McDonnell's counsel asked for a curative instruction and requested "a mistrial based on witness misconduct." The trial court denied the motion for mistrial, but it instructed the jury to disregard Orsak's statement about the prior incident:

> What you just heard from this witness about a prior act is not to be considered by you, it's not to be thought of or talked about during your deliberations. It's going to be part of this record; however, it does not concern what is on trial here today, and that is only the offense that [the State] read to you in the information at the beginning of this trial. That is what the defendant is accused of in this matter, nothing else today. So confine your thoughts, your deliberations, all of your efforts in this matter only to what is in the information that the defendant is accused of formally and on trial for today. Do you understand that completely? Anyone have any question about that?

10

No one in the jury voiced any questions or concerns, and the trial continued.

McDonnell argues that the trial court abused its discretion in denying his motion for mistrial following Orsak's spontaneous statement that McDonnell had struck her before and had broken a bone in her face. We conclude, however, that any prejudice caused by Orsak's comment was cured by the trial court's instruction to the jury to disregard her statement. The conduct in the case was not very severe. Orsak's statement was unsolicited and unresponsive to the State's question. Her statement was short, and it did not involve an extensive amount of testimony. *See Hawkins*, 135 S.W.3d at 77 (holding that one factor court to consider in determining whether trial court erred in denying mistrial is severity of misconduct).

Following McDonnell's objection, the jury was immediately instructed to disregard Orsak's statement. *See id.* (holding that courts should consider effectiveness of curative measures taken). "Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Hernandez v. State*, 454 S.W.3d 643, 649–50 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Nothing in the record demonstrates that the jury was confused about the trial court's instruction to disregard or that the jurors failed to follow it. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App.

2009) (holding that "[i]nstructions to the jury are generally considered sufficient to cure improprieties that occur during trial" and that courts "generally presume that a jury will follow the judge's instructions").

McDonnell argues that witness credibility was especially important in this case because his and Orsak's accounts of the events differed. He asserts that he was harmed by her testimony that he had previously broken a bone in her face "because his credibility was sullied before he even testified." This argument disregards the fact that the evidence of the volatile nature of their relationship was introduced through other testimony as the trial progressed and before he testified on his own behalf. This included testimony that McDonnell had assaulted Orsak on numerous other occasions and evidence that Orsak had filed a police report against McDonnell on at least one other occasion.

Granting a motion for mistrial is appropriate only when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant." *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011); *see also Hawkins*, 135 S.W.3d at 77 (holding that mistrial is remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile"). In light of the limited nature of Orsak's remark and the additional evidence of McDonnell's prior abuse of Orsak, we cannot say that Orsak's

unsolicited statement played a significant role in the jury's decision to convict McDonnell despite the trial court's instruction to disregard, nor was it so highly prejudicial and incurable that the trial court erred by denying the motion for mistrial. *See Hernandez*, 454 S.W.3d at 650; *see also Hawkins*, 135 S.W.3d at 77 (holding that courts should consider certainty of conviction absent misconduct).

We overrule McDonnell's first issue.

## Extraneous-Offense Evidence

In his second and third issues, McDonnell argues that the trial court erred in allowing evidence that McDonnell had previously threatened and assaulted Orsak.

### A.     Standard of Review

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion, and we will not reverse if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

In general, relevant evidence is admissible. TEX. R. EVID. 402. Relevant evidence is evidence that tends to make a fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401; *see Shuffield v. State*, 189 S.W.3d 782, 786–87 (Tex. Crim. App. 2006).

Evidence of a crime, wrong, or act other than the offense charged is not admissible to prove that the defendant acted in conformity with his character but may be admissible for other purposes. TEX. R. EVID. 404(b)(1) ("Evidence of a

13

crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see also Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Robles v. State*, 85 S.W.3d 211, 213 (Tex. Crim. App. 2002) (evidence of extraneous offenses is normally inadmissible). However, such evidence may be admissible when it has "relevance apart from character conformity," such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2); *see also Devoe*, 354 S.W.3d at 469.

In addition to Rule 404(b), Texas Code of Criminal Procedure article 38.371 applies in family-violence cases and permits the introduction of evidence "of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense." TEX. CODE CRIM. PROC. art. 38.371(b). This includes the admission of evidence "regarding the nature of the relationship between the actor and the alleged victim." *Id.* While the provision expressly states that it is "subject to the Texas Rules of Evidence [and] other applicable law," and that "[t]his article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law," *see id.* art. 38.371(b)-(c), courts have held that article 38.371 "expressly provides for the admission of extraneous offense evidence regarding the

14

nature of the relationship between an accused and a complainant." *James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.). "Areas of relevant and admissible extraneous-offense evidence that complies with article 38.371," and that serve non-character-conformity purposes in compliance with Rule 404(b), "include evidence that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between victim and assailant." *Fernandez v. State*, 597 S.W.3d 546, 565 (Tex. App.—El Paso 2020, pet. ref'd) (citing *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.)); *see Camacho v. State*, No. 01-20-00282-CR, 2021 WL 2832970, at *6 (Tex. App.—Houston [1st Dist.] July 8, 2021, no pet.) (mem. op., not designated for publication).

Even when evidence is relevant or admissible under Rule 404(b) or another rule of evidence, a court may nevertheless exclude the evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. To determine whether to admit or exclude evidence over a Rule 403 objection, the trial court must balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any

tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume a significant amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

## B.    Analysis

McDonnell argues that the trial court abused its discretion by admitting evidence that he had previously assaulted Orsak and that he had threatened her with regard to her testimony in this case. The trial court originally excluded any testimony or reference to other assaults or threats that McDonnell had allegedly made against Orsak. As the trial progressed, however, McDonnell's theory of the case was that Orsak was lying about the assault as evidenced by their on-going relationship. After McDonnell sought to introduce an email from Orsak in which she provided McDonnell with a form that he could use to enter his plea of not guilty in this case and another email in which she offered to replace a gun that she had taken with her when they separated, the State re-urged its motion "to be allowed to offer extraneous offense evidence."

The State argued that by offering evidence of Orsak's and McDonnell's continued interactions, McDonnell was essentially arguing that her testimony about the assault was not believable and opened the door for the State to rebut that

16

evidence with extraneous-offense evidence and with evidence from the expert regarding why abused women sometimes returned to their abusers and why they would recant allegations or seek to have criminal charges dismissed. McDonnell objected under Rules of Evidence 403 and 404(b) and article 38.371. The trial court overruled McDonnell's objections, but it agreed to give a limiting instruction both when the testimony was given and in the charge.

The trial court admonished the jury on the record, prior to introduction of the testimony, that it would hear evidence of other wrongful acts McDonnell "may have committed" in order to "contextualize the relationship between [Orsak] and [McDonnell]." The trial court gave a verbal instruction that the jury was not to consider the evidence of those wrongful acts unless it found beyond a reasonable doubt that McDonnell committed them and that such evidence could only be considered for the limited purpose of contextualizing the relationship, not to prove that McDonnell is a bad person and was therefore more likely to commit the charged offense.

Orsak then testified that McDonnell had assaulted her "[m]ore than ten [times]—numerous" times. Orsak eventually described two specific incidents—one in which he pushed her, and another in which he punched her in the face. She testified that she had filed a police report regarding an incident that had occurred in 2016. The trial court's instructions about the extraneous offenses were likewise

included in the jury charge. Orsak testified that McDonnell threatened to send sexually-explicit pictures of her to the court and to current or former boyfriends because she was planning to testify against him, and he threatened to "destroy" her.

When it sought to admit this evidence, the State argued that the evidence was necessary under article 38.371(b) to contextualize the relationship between McDonnell and Orsak and to rebut the defensive theory that Orsak was lying about the assault because she repeatedly continued to associate with and communicate with McDonnell following the assault. We agree with the State. Evidence of McDonnell's prior assaults and threats against Orsak were "relevant facts and circumstances that would assist the trier of fact in determining whether [McDonnell] committed the offense" because it illuminated "the nature of the relationship between [McDonnell and Orsak.]" *See* TEX. CODE CRIM. PROC. art. 38.371(b). The evidence of McDonnell's prior assaults and threats falls within the type of evidence courts have recognized as falling under both article 38.371 and Rule 404(b). *See Fernandez*, 597 S.W.3d at 565 (article 38.371 permits admission of evidence "that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted— statements to police; or (3) contextualizes the nature of the relationship between victim and assailant"); *Gonzalez*, 541 S.W.3d at 312 (same); *see also De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (holding that one well-

18

established rationale for admitting evidence of extraneous misconduct under Rule 404(b) is to rebut defensive theory that negates element of offense). We conclude that the trial court did not abuse its discretion in concluding that this evidence was admissible pursuant to Rule 404(b) or article 38.371.

We likewise conclude that the trial court did not abuse its discretion in ruling that this evidence was admissible under Rule 403. McDonnell argues that the evidence's probative value was substantially outweighed by the danger of unfair prejudice. Considering the elements of the Rule 403 balancing test, we disagree. The probative force of the evidence of McDonnell's other bad acts, including prior assaults and threats against Orsak, was particularly relevant here where the credibility of the witnesses was a central issue in the case. Orsak's need for the evidence was increased by evidence McDonnell admitted showing that, despite her allegation of assault, she continued to associate with and communicate with him. *See Gigliobianco*, 210 S.W.3d at 641–42 (setting out elements of Rule 403 balancing test).

The extraneous acts introduced into evidence did not have a tendency to confuse or distract the jury, as the prior assaults and threats were related to the charged offense in this case. The evidence was not cumulative because the repeated nature of the abuse over time showed the complete picture of the relationship. *See Camacho*, 2021 WL 2832970, at *8. The evidence pertained to

19

McDonnell's history of abuse against Orsak, her fear, and her reasons for her ongoing contact with McDonnell despite her allegations of assault. *See James*, 623 S.W.3d at 547–48.

Presenting the extraneous evidence did not take an inordinate amount of time. *See Hernandez v. State*, 203 S.W.3d 477, 481 (Tex. App.—Waco 2006, pet. ref'd) (upholding admission of extraneous-offense evidence over Rule 403 objection when it took less time to develop extraneous offense than charged offense). Finally, the evidence of the extraneous bad acts was similar to the charged assault, both including verbal threats and physical contact. The trial court gave limiting instructions on the record when the evidence was admitted and in the jury charge, and we presume the instructions mitigated any potential the evidence had to irrationally affect the jurors. *See James*, 623 S.W.3d at 549. Appellant failed to rebut this presumption. *Id.*

We conclude that the trial court did not abuse its discretion in admitting evidence of McDonnell's extraneous bad acts. We overrule McDonnell's second and third issues.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Publish. TEX. R. APP. P. 47.2(b).